# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

TIMOTHY A. JOHNSON,

                Plaintiff,

v.                                                    CIVIL ACTION NO.    2:21-cv-00380

WEST VIRGINIA UNIVERSITY BOARD
OF GOVERNORS, et al.,

                Defendants.

### PROPOSED FINDINGS & RECOMMENDATION

This matter is assigned to the Honorable Thomas E. Johnston, Chief United States District Judge, and it is referred to the undersigned United States Magistrate Judge for submission of proposed findings and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (ECF No. 4.) Pending before the court is the Motion for Partial Summary Judgment filed by Plaintiff Timothy A. Johnson ("Plaintiff"). (ECF No. 97.) Therein, Plaintiff seeks summary judgment as to his deliberate-indifference claim against Defendant Ghassan Ghorayeb, M.D. ("Defendant" or "Dr. Ghorayeb") under 42 U.S.C. § 1983. For the reasons set forth herein, the undersigned respectfully **RECOMMENDS** that Plaintiff's motion be **DENIED**, as Defendants have come forward with sufficient proof in the form of admissible evidence to show that—at least at this juncture—genuine disputes of material fact remain on two essential elements of Plaintiff's § 1983 claim against the Defendant, Dr. Ghorayeb.

## I.    BACKGROUND

This civil action arises from medical care Plaintiff received from Dr. Ghorayeb and Defendant Lingo Lai, M.D. ("Dr. Lai") at the West Virginia Eye Institute during Plaintiff's term of incarceration at the Federal Correctional Institution in Morgantown, West Virginia ("FCI-Morgantown"). (ECF No. 16 at 4 ¶¶ 17-23.) Plaintiff asserts that he was assessed by Dr. Ghorayeb at the Eye Institute on January 11, 2018 for an inflammatory condition called sarcoidosis[1] in his right eye, but that Dr. Ghorayeb delayed treatment with a "first line" course of the oral steroid Prednisone until July 3, 2018; Plaintiff claims that this delay necessitated surgery and resulted in irreversible loss of vision that rendered him legally blind in his right eye, which he alleges was the only eye in which he had any sight remaining. *Id.* at 8, ¶ 45.

It is undisputed that Plaintiff had problems in both eyes that long predated his treatment with Dr. Ghorayeb. In 2010—nearly a decade before the events which give rise to this action—Plaintiff was referred by Steven J. Hosman, O.D., to David J. Hunt, M.D. of Retina Consultants, PLLC. (ECF No. 101-1.) Dr. Hunt evaluated Plaintiff on April 19, 2010. *Id.* Dr. Hunt reported that Plaintiff "has longstanding poor vision in both eyes" and that "the vision has decreased in the right eye over the past eight years but it has

---

[1] Dr. Camille Johnson—a primary-care physician who is licensed in the State of Michigan and certified with the American Board of Internal Medicine—offered her medical opinion in Plaintiff's Medical Screening Certificate of Merit. (ECF No. 106-1 at 8.) Therein, Dr. Johnson explained that sarcoidosis is a disease characterized by the growth of tiny collections of inflammatory cells called granulomas in the body. (ECF No. 106-1 at 9.) These granulomas are most commonly found in the lungs and lymph nodes, but sarcoidosis can also affect the eyes, skin, heart and other organs. (ECF No. 106-1 at 9.) Sarcoidosis affecting the eyes is called ocular sarcoidosis. Dr. Johnson explained that "[s]arcoidosis can be difficult to diagnose because the disease often produces few signs and symptoms in its early stages," and "[w]hen symptoms do occur, they may mimic those of other disorders." (ECF No. 106-1 at 9.) The common symptoms of ocular sarcoidosis identified by Dr. Johnson are blurred vision or vision loss, light sensitivity, floaters, dry or itchy eyes, red eyes, burning sensation in the eyes, or eye pain; Dr. Johnson further stated that sarcoidosis can also cause uveitis, dry eye syndrome, and glaucoma, and that associated inflammation "can affect almost any part of the eye and may cause damage to the retina, which can eventually cause blindness." (ECF No. 106-1 at 9.) Rarely, sarcoidosis can also cause cataracts and glaucoma. *Id.*

been quite stable during this time period." *Id.* Dr. Hunt also noted that Plaintiff "does have a history for bilateral cataracts that he tells me were due to his sarcoidosis," and that he "remains on Prednisone [twice daily] in both eyes[.]" *Id.* On examination, Dr. Hunt noted that "[t]he posterior segment on the right shows fibroglial tissue on the disc extending into the mid vitreous. This does not appear to be neovascularization but rather fairly dense fibroglial tissue. It may be an opacified posterior hyaloid." *Id.* at 2. Dr. Hunt concluded that "[i]n the right eye there appears to be both chronic fibroglial tissue on the disc as well as a chronic peripheral retinal detachment." *Id.* Further, Dr. Hunt noted that treatment was "quite difficult," as Plaintiff "already has longstanding chronic poor vision loss down to 20/100 level yet this is his better eye." *Id.* "Due to the fairly convoluted past ocular history," Dr. Hunt requested a copy of Plaintiff's medical records from the referring physician, Dr. Hosman. *Id.* at 3. Dr. Hunt also requested that Dr. Hosman disclose whether he had "any knowledge of the underlying cause for the [Plaintiff's] prior vision loss in the right eye." *Id.*

In 2016, Plaintiff was sentenced to sixty months in federal prison. *See United States v. Johnson*, 2:15-cr-99, ECF No. 53 (S.D. W. Va. Mar. 23, 2016). Plaintiff entered into BOP custody at FCI-Morgantown on May 3, 2016. (ECF No. 106-1 at 65.) In a signed document titled "West Virginia Code § 55-7B-6(c) Statement,"[2] Plaintiff stated that he entered into BOP custody "with a known diagnosis of chronic sarcoidosis." (ECF No. 106-1 at 6.) At his initial medical examination at FCI-Morgantown, Plaintiff

---

[2] This statute is part of West Virginia's Medical Professional Liability Act, and permits a plaintiff who believes no screening certificate of merit is necessary to file "a statement specifically setting forth the basis of the alleged liability of the health care provider in lieu of a screening certificate of merit." W. Va. Code § 55-7B-6(c). The Court notes that Plaintiff attempted to self-notarize this document with his own signature, but it is not stamped by a Notary Public. Nonetheless, because filings by *pro se* parties are to be afforded a liberal construction, the undersigned construes this document as an Affidavit for the purposes of the subject motion.

reported longstanding eye conditions, including complete blindness in his left eye, limited vision in his right eye, and glaucoma; further, he reported that he had been diagnosed with sarcoidosis. *Id.* BOP medical records from May 12, 2016 show that Plaintiff was observed being able "to ambulate back to waiting room from exam room" by himself, negotiating "the door way, wall, protruding cabinets and other inmates without incident or attempting to feel for landmarks or assistance from staff." (ECF No. 106-1 at 39, 53.) Plaintiff was able to sign a consent form "with minimal assistance," was "observed looking at various objects in office/wall," and opened his mouth in anticipation of a temperature probe before the probe reached his mouth. *Id.* After being examined by a BOP optometrist, the BOP referred Plaintiff to the West Virginia University Medical Corporation d/b/a University Health Associates – West Virginia Eye Institute (the "Eye Institute").[3] (ECF No. 106-1 at 6.)

Plaintiff presented to the Eye Institute for his initial visit on June 14, 2016, where he was evaluated by ophthalmologist Dr. Kenneth Mitchell. (ECF No. 1-3 at 52.) Plaintiff states that he reported his last visit with an eye doctor was "about 10 years ago," and "that he thought his vision in his right eye was getting worse" at this visit. (ECF No. 106-1 at 6.) Plaintiff states that he was assessed with "uveitic glaucoma, advanced OU (in both eyes) – suspect sarcoid as etiology." (ECF No. 106-1 at 6.) Plaintiff's medical records show that Dr. Mitchell noted Plaintiff's right-eye visual acuity allowed him to see only hand motions at his face. (ECF Nos. 1-3 at 52; 101-2.) Dr. Mitchell also noted Plaintiff's reported history of glaucoma, sarcoidosis, and poor vision in his right eye. *Id.* Upon examination, Dr. Mitchell noted a fibrosis near the optic nerve in Plaintiff's right

---

[3] It is undisputed that West Virginia University contracts with the federal government to provide health care services, including ophthalmology services, to federal inmates. (ECF No. 1-3 at 33.)

eye; thereafter, Plaintiff was referred to several specialists at the Eye Institute to assist in investigating the cause of Plaintiff's symptoms. (ECF No. 106-1 at 56.)

Also while at FCI-Morgantown, Plaintiff was seen by BOP physicians Dr. Vibeke O. Dankwa and Dr. Kenneth Gomez with the facility's chronic care clinic. (ECF No. 106-1 at 10.) On March 30, 2017, Dr. Dankwa reviewed lab results which indicated that Plaintiff had high chloride and uric acid levels—which Dr. Camille Johnson in Plaintiff's Medical Screening Certificate of Merit opined may be associated with sarcoidosis.[4] *Id.* Additionally, on April 12, 2017, Dr. Dankwa reviewed laboratory testing results which indicated that Plaintiff had an elevated amount of angiotensin-converting-enzyme ("ACE") in his blood. (ECF No. 106-1 at 10.) Per Dr. Johnson, the granulomas associated with sarcoidosis can increase "ACE" levels; the normal range is less than 40 units per liter, but Plaintiff's laboratory results indicated an ACE serum level of 81 units per liter. *Id.* It is undisputed that Dr. Dankwa did not inform the Eye Institute of these laboratory findings, and did not prescribe corticosteroids or other inflammation-reducing medications to Plaintiff. *Id.*

In December 2017, Plaintiff was seen by Dr. Lai at the Eye Institute. (ECF No. 106-1 at 65.) Plaintiff reported increased light sensitivity and flashes of light "that were noted on last visit in November as well," along with worsening vision, floaters, photophobia—the medical term for light sensitivity—and "a hard time focusing" in his right eye. (ECF No. 106-1 at 65-66, 72.) Dr. Lai noted a "very difficult dilated exam secondary to small palpebral fissure and [Plaintiff's] photophobia." *Id.* at 72. However,

---

[4] Defendant asserts that Plaintiff's Medical Screening Certificate of Merit is not admissible evidence pursuant to West Virginia law; nonetheless, because filings made by *pro se* parties are to be construed liberally, this Court has found that a *pro se* plaintiff's Screening Certificate of Merit may be considered as evidence in the Court's adjudication of a motion for summary judgment. *See Sumpter v. United States*, No. 5:16-CV-08951, 2019 WL 7559842, at *20 (S.D.W. Va. July 2, 2019), *report and recommendation adopted*, No. 5:16-CV-08951, 2019 WL 4491517 (S.D.W. Va. Sept. 18, 2019).

Dr. Lai was able to observe "fibrosis near [Plaintiff's optic] nerve" as well as "1+ flare, trace cell." *Id.* Dr. Lai discussed "the signs and symptoms of retinal detachment in detail with [Plaintiff] including flashes of light." *Id.* Dr. Lai prescribed Durezol—a type of ophthalmic corticosteroid eye drops—and referred Plaintiff both to Dr. McMillan for management of "uveitic glaucoma," and to Dr. Ghorayeb to evaluate Plaintiff for retinal detachment as well as evaluation of the fibrosis identified near the optic nerve. (ECF No. 106-1 at 65, 72.)

Dr. Ghorayeb saw Plaintiff for an initial consultation on January 11, 2018. (ECF No. 106-1 at 65, 83.) It is undisputed that Dr. Ghorayeb did not request Plaintiff's medical records from the BOP. Dr. Ghorayeb assessed Plaintiff for sarcoidosis, pseudophakia of both eyes, and chronic uveitis of both eyes. (ECF No. 106-1 at 70.) Medical records from this visit noted a  "difficult examination" with a poor view to the back of the right eye, but Dr. Ghorayeb was able to see fibrosis starting around Plaintiff's optic nerve; fluid pressure in the eye was noted as stable, but Dr. Ghorayeb also noted a "[t]race  cell with 2+ flare." (ECF No. 106-1 at 70, 82.) Dr. Ghorayeb noted that it was "unclear" whether the fibrosis had been present before, but the "[o]verall traction from fibrosis [was] not significant." *Id.* Further, Dr. Ghorayeb indicated Plaintiff may have an "Inferior BRAO," or branch retinal artery occlusion. (ECF No. 106-1 at 70.) Dr. Ghorayeb directed Plaintiff to continue on his prescribed Durezol eye drops, and noted that he would "monitor and reassess in 4 months." *Id.* Additionally, Dr. Ghorayeb noted that he would "consult Pulmonology to confirm lack of systemic progression and lack of need for systemic treatment." *Id.*

On February 12, 2018, Dr. Dankwa at FCI-Morgantown reviewed laboratory results from a second blood draw indicating that—eleven months after BOP physicians

first tested the ACE levels in Plaintiff's blood—Plaintiff's ACE level continued to be elevated, at sixty-two units per liter. (ECF No. 106-1 at 10.) Dr. Dankwa again did not inform the Eye Institute of these results, and did not prescribe anti-inflammatory medication.

On May 2, 2018, Plaintiff presented to Pulmonary/Critical Care Fellow Mohamad B. Abdelfattah, M.D., and Dr. Abdelfattah's attending pulmonologist, Hatim Al-Jaroushi, M.D., on referral from Dr. Ghorayeb. (ECF No. 106-1 at 87-88.) Medical records from that visit note that Plaintiff reported as follows:

> [Plaintiff] was diagnosed with sarcoidosis in 1994 and is unsure if he received a biopsy. He was started on systemic steroids in 2002 after an eye surgery. He was on the steroids for only a few months and had been off them until about 3-4 months ago when they were started again for hip pain. He state[d] the hip pain did not improve significantly after two months of recent steroids.

*Id.* at 87. Dr. Abdelfattah also noted that Plaintiff "denies any active pulmonary complaints and does not currently have an indication for treatment of his sarcoidosis." *Id.* at 88. Dr. Abdelfattah ordered several tests, encouraged Plaintiff to follow up regularly with his ophthalmologist, and directed him to return in six months. *Id.*

Approximately two weeks later on May 15, 2018, Plaintiff presented to Dr. Ghorayeb for his four-month follow-up appointment. (ECF No. 106-1 at 74.) Plaintiff reported that his light sensitivity had not improved since the last visit, but his vision had not changed; he denied any current eye pain. *Id.* at 66, 74. Dr. Ghorayeb noted that "[v]ision in both eyes are stable. No problem with flashing or curtains in both eyes." *Id.* at 89. Dr. Ghorayeb further noted that Plaintiff saw Dr. Abdelfattah, who had ordered baseline testing. *Id.* Dr. Ghorayeb directed Plaintiff to follow up in three months. *Id.*

Laboratory tests ordered by the BOP on June 4, 2018, indicated elevated levels of chloride and creatinine; Dr. Dankwa at FCI-Morgantown reviewed these test results the following day, but again did not disclose this information to the Eye Institute and did not prescribe anti-inflammatory medication. (ECF No. 106-1 at 10.)

On June 22, 2018, approximately a month after his visit with Dr. Ghorayeb, Plaintiff presented to the Emergency Department at West Virginia University Hospital in Morgantown, West Virginia (the "Emergency Department") complaining of headaches on the left side of his head that began five or six days before. (ECF No. 106-1 at 37, 50, 75.) Plaintiff reported "a h[istory] of headaches, however they typically resolved spontaneously and did not last this long." *Id.* Plaintiff also reported "associated blurred vision in R[ight] eye, photophobia, and dizziness" which followed the development of the headaches. *Id.* at 66, 75. On examination, Plaintiff reported he "can only see shapes in [his] right eye." *Id.* at 38, 51, 90. Additionally, Plaintiff's right cornea was noted to be cloudy. *Id.* at 37, 51. Plaintiff was prescribed "IVF bolus, Compazine and Benadryl" and examined by ophthalmology in the Emergency Department, who found that Plaintiff's vision was "at baseline" upon physical examination. *Id.* Ophthalmology instructed the Emergency Department that Plaintiff was "suitable for discharge with follow up and prescription eye drops." *Id.*

Eleven days later on July 3, 2018, Plaintiff followed up with Dr. Ghorayeb for "Retina Problem" and informed him that he was seen in the Emergency Department for a flare up. (ECF No. 106-1 at 51, 76.) Plaintiff reported decreased vision "to the point that it is very difficult to see to get around" over the previous month, as well as photophobia and cloudiness. *Id.* at 76. Dr. Ghorayeb's diagnosis was gout, pseudophakia of both eyes, and "[g]laucoma of both eyes associated with ocular inflammation,

8

indeterminate stage." *Id.* at 77. Dr. Ghorayeb's plan of care was to "check some baseline labs to [rule out] infection and start 60 mg of oral prednisone," but he also noted that "[u]pon improvement of inflammation, would need to consider rheum[atology] referral for steroid sparing agents." *Id.* at 78. Dr. Ghorayeb further noted that "[o]nce quiet or if diagnosis remains elusive, may consider [a] therapeutic vs diagnostic PPV" surgery. *Id.*

A week later on July 10, 2018, Plaintiff reported to Dr. Hinkle at the Eye Institute due to Dr. Ghorayeb's absence. (ECF No. 101-6.) Plaintiff reported that he was taking his prescribed 60 mg of Prednisone, but his right-eye vision had worsened over the past four or five days to the point that he could "see light and movement only." *Id.* Additionally, Plaintiff "state[d] he thinks the steroid caused his vision to decrease." *Id.* Records from that visit note that "vision is much worse on prednisone." *Id.* at 3. Plaintiff's right-eye visual acuity was noted to be "CF @ 8"," meaning he was able to count fingers from a distance of eight inches. *Id.* at 4. Dr. Hinkle's ophthalmic plan of care was to discontinue prednisone. (ECF No 106-1 at 3, 34, 48.) Dr. Hinkle discussed the option of prescribing the "steroid-saving" drug methotrexate, but "given worsening of symptoms on prednisone will discontinue this now and reassess in 2-3 weeks." *Id.*

On July 25, 2018, Plaintiff again presented to the Emergency Department and reported that he had finished his oral course of Prednisone approximately a week before. (ECF No. 106-1 at 79.) Plaintiff reported that he "had significant worsening of his [right] eye pain," including "sudden pain and flashing lights in his *left* eye" that morning as well as blurry vision and a "sandpaper like" feel. *Id.* at 66.

On July 30, 2018, Plaintiff returned to the Eye Institute for his three-week follow-up appointment, where he was seen by Dr. McMillan. (ECF No. 106-1 at 80.) Medical records from that visit note that Plaintiff "is taking Prednisone and feels that it makes

his vision worse." *Id.* Plaintiff described his vision as "cloudy and blurry," and he reported that his right eye "has 'lights' all the time" that worsened whenever waking up from sleep. *Id.* at 66, 80.

The following day on July 31, 2018, Plaintiff returned to the Eye Institute. (ECF No. 106-1 at 66.) Dr. Ghorayeb noted that "Patient states he was here yesterday and was told to return. No pain. Vision is the same. Using all the same drops." (ECF Nos. 106-1 at 66, 81; 101-7 at 1.) Plaintiff reported "no improvement with drops." (ECF No. 101-7 at 3.) Dr. Ghorayeb recommended proceeding with "[d]iagnostic/therapeutic vitrectomy" surgery on Plaintiff's right eye, and indicated that he would send a biopsy from the procedure "for cytology and pathology" in order to rule out lymphoma. (ECF No. 101-7 at 4.)

In August 2018, Dr. Ghorayeb performed "a diagnostic and therapeutic pars plana vitrectomy" surgery on "fibrosis starting around nerve" in Plaintiff's right eye, and a biopsy of the vitreous fluid was sent to a laboratory for testing. (ECF Nos. 106-1 at 66; 101-7 at 4.) The laboratory results were negative for malignant cells, with "[n]o large atypical lymphocytes, blasts or granulomas identified." (ECF No. 101-8.)

On October 16, 2018, Plaintiff was seen by a rheumatologist and started on the "steroid saving" drug methotrexate. (ECF No. 106-1 at 94.) Plaintiff reported at this visit that "he was diagnosed with sarcoidosis in 1993, but has never had a lymph node biopsy." (ECF No. 101-9.)

Plaintiff's medical records reflect that he returned to the pulmonology clinic in November 2018, where Dr. Abdelfattah prescribed "steroids" after detecting elevated levels of calcium "given a prolonged high hiatus for treatment." (ECF No. 106-1 at 94.) Four months later on March 1, 2019, Plaintiff was evaluated at the West Virginia

University Hospital's interstitial lung disease clinic. (ECF No. 106-1 at 94.) Plaintiff reported he "was [fir]st diagnosed [with sarcoidosis] in the early 90s and was initially treated with steroids followed by methotrexate." *Id.* Further, it was noted that Plaintiff "was supposed to stay on 10 mg prednisone but has stopped using it 2 months ago." (ECF No. 106-1 at 94.)

On October 22, 2019, Plaintiff's right-eye visual acuity was noted as being able to see directional hand motions at a distance of six inches. (ECF No. 101-11 at 5.) On June 15, 2020, Plaintiff's right-eye visual acuity indicated he was able to count fingers at a distance of two feet. (ECF No. 101-12.)

In his "West Virginia Code § 55-7B-6(c)[5] Statement" dated May 28, 2020, Plaintiff stated that "Drs. Brian McMillian, M.D.; Dr. Lingo Lai, M.D. and Dr. Ghassan Richard Ghorayeb, M.D. breached the medical standard of care by failing to systemically treat Mr. Johnson's underlying sarcoidosis condition and the resulting uveitis inflammation[.]" (ECF No. 106-1 at 7.) Plaintiff stated that this failure "caused him to lose sight in his right eye." *Id.*

Derrick McDaniel, a Corporal with the City of Charleston Police Department and a friend of Plaintiff's, attested that he has known Plaintiff since 2010. (ECF No. 106-1 at 23.) Mr. McDaniel attested that he "did not know that [Plaintiff] was suffering from eye problems" based upon his observations of Plaintiff in business and social settings,

---

[5] This statute is part of West Virginia's Medical Professional Liability Act; Plaintiff's specific citation within the statute provides as follows:

> if a claimant or his or her counsel believes that no screening certificate of merit is necessary because the cause of action is based upon a well-established legal theory of liability which does not require expert testimony supporting a breach of the applicable standard of care, the claimant or his or her counsel shall file a statement specifically setting forth the basis of the alleged liability of the health care provider in lieu of a screening certificate of merit.

W. Va. Code § 55-7B-6(c).

stating that Plaintiff was able to select music from a Jukebox display, act as the owner of an apparel store, and count out change to patrons while operating a mobile food concession business at night. *Id.* Further, Mr. McDaniel attested that in 2015, he rode as a passenger while Plaintiff drove his Cadillac Escalade; Mr. McDaniel attested that Plaintiff "drove competently and I was never alerted to any driving that caused me concern." *Id.* Mr. McDaniel attested that "since [Plaintiff] has returned from BOP custody," McDaniel observed that Plaintiff needed help getting around, required "other people to read important documents to him," required assistance with counting money, and "refuse[d] to go out after dark complainting that he [wa]s unable to see." (ECF No. 106-1 at 23.) McDaniel concluded by attesting that from his observations, Plaintiff's sight "has drastically changed since 2015." *Id.*

Plaintiff initiated this civil action on August 5, 2020, in the Circuit Court of Kanawha County, West Virginia. (ECF No. 1-3.) On March 1, 2021, Plaintiff filed an Amended Complaint asserting a medical-malpractice claim against the West Virginia University Board of Governors ("WVUBOG"), Dr. Ghorayeb, and Dr. Lai (collectively, the "WVU Defendants"), as well as the Eye Institute.[6] (ECF No. 16.) Plaintiff further asserted deliberate-indifference claims under 42 U.S.C. § 1983 against Dr. Ghorayeb and Dr. Lai based upon their failure to prescribe—or alternatively, their delay in prescribing—oral Prednisone to treat Plaintiff's alleged chronic sarcoidosis.

In Plaintiff's Medical Screening Certificate of Merit, Dr. Johnson opined that "there is no dispute or question that [Plaintiff] was suffering from chronic sarcoidosis when he entered BOP custody and began treatment with the ophthalmologist at WVU."

---

[6] Plaintiff also asserted a claim against West Virginia University Hospitals, Inc. ("WVUH"); however, the Court dismissed this claim and WVUH was terminated as a party on March 28, 2022. (ECF No. 83.)

(ECF No. 106-1 at 9.) Dr. Johnson opined that treatment of underlying chronic sarcoidosis "must be immediate and aggressive." (ECF No. 106-1 at 68.) Dr. Johnson added as follows:

> Corticosteroid medications are considered the first line of treatment for sarcoidosis that requires therapy. Oral corticosteroids effectively reduce systemic inflammation in most people, thereby slowing, stopping or even preventing organ damage. There is currently no cure for sarcoidosis but symptoms can usually be managed with corticosteroids or other medicines such as methotrexate, a corticosteroid-sparing drug. Upon observation of active inflammation, the well-established standard of care is to prescribe an anti-inflammation drug or medicine.

(ECF No. 106-1 at 9-10.)

Dr. Johnson further opined that BOP physician, Dr. Dankwa, breached the standard of care; Dr. Johnson stated, "[i]t is my professional medical opinion that there is a reasonable degree of medical probability that Dr. Dankwa's failure to treat systemically [Plaintiff's] active sarcoidosis while in her medical care" allowed Plaintiff's condition to remain uncontrolled, which resulted in organ damage to Plaintiff's eye. (ECF No. 106-1 at 11 (emphasis added).) Dr. Johnson added that, in her medical opinion, Dr. Ghorayeb "failed to treat Mr. Johnson according to the well-established standard of care for chronic sarcoidosis with ocular involvement by failing to prescribe prednisone or any other inflammation controlling drug from the time that Mr. Johnson became a patient on January 11, 2018 until August 6, 2018." (ECF No. 106-1 at 65.) Dr. Johnson opined that "there is a reasonable degree of medical probability that Dr. Ghorayeb's failure to treat systemically [Plaintiff's] active sarcoidosis while in his medical care beginning January 11, 2018, caused further organ (eye) damage necessitating eye surgery on August 6, 2018, and subsequent blindness." (ECF No. 106-1 at 67-68.) Dr. Johnson concluded that, "to a reasonable degree of medical certainty, if

[Plaintiff] had been treated with corticosteroids and had been properly monitored, he would not have suffered vision loss or been required to have eye surgery due to this inflammation from active sarcoidosis." (ECF No. 106-1 at 65.)

Subsequently on July 1, 2021, Defendants removed the action to this Court. (ECF No. 1.) Judge Johnston entered a Scheduling Order on August 24, 2021. (ECF No. 31.) Subsequently on January 13, 2022, Judge Johnston vacated the Scheduling Order after referring this matter to the undersigned "for total pretrial management and submission of proposed findings of fact and recommendations for disposition." (ECF No. 77.) The undersigned entered a new Scheduling Order on February 13, 2023, under which the deadline to complete discovery is set for October 13, 2023, and the deadline for the parties to move for summary judgment is set for November 27, 2023. (ECF No. 136.)

In his motion for partial summary judgment, Plaintiff seeks "an order granting partial summary judgment as to Dr. Ghassan Ghorayeb as to deliberate indifference regarding the medical care rendered to his patient, Timothy A. Johnson[.]" (ECF No. 97 at 1.) Specifically, Plaintiff asserts that "there is 'no genuine issue as to any material fact regarding Dr. Ghorayeb's failure to treat Timothy A. Johnson's previously diagnosed medical condition of chronic sarcoidosis with ocular involvement." (ECF No. 97 at 1.) In support of his motion, Plaintiff quoted from, but did not submit, Dr. Ghorayeb's responses to Plaintiff's Requests for Admissions; he also submitted three pages from his medical records, as well as an Ophthalmology Exam Description published by the American Board of Physician Specialties. (ECF No. 98 at 16-20.) In response, Dr. Ghorayeb submitted his own Affidavit as well as an extensive number of medical records. (ECF Nos. 101-1 through 101-13.) With his reply, Plaintiff submitted his "West Virginia Code § 55-7B-6(c) Statement," along with a copy of his Medical Screening

Certificate of Merit, signed by Camille Johnson, M.D.; the Affidavit of Derrick McDaniel; an extensive number of additional medical records; Dr. Ghorayeb's answers to Plaintiff's Requests for Admissions; and an Order granting a motion for partial dismissal in *Johnson v. United States et al.*, 3:20-cv-157, Document No. 98 (N.D. W. Va. September 28, 2021). The undersigned has considered all of the evidence presented by the parties in making the instant recommendation. The motion has now been fully briefed and is ripe for adjudication.

## I.    LEGAL STANDARD

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material when it 'might affect the outcome of the suit under the governing law.'" *Strothers v. City of Laurel*, 895 F.3d 317, 326 (4th 19Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A genuine dispute arises when 'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" *Id.* (quoting *Anderson*, 477 U.S. at 248). "Thus, at the summary judgment phase, the pertinent inquiry is whether there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018) (alteration, internal quotation marks omitted).

"The burden is on the nonmoving party to show that there is a genuine issue of material fact for trial . . . by offering sufficient proof in the form of admissible evidence[.]" *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). In ruling on a motion for summary judgment, this Court "view[s] the facts and all justifiable inferences arising therefrom in the light most favorable to the nonmoving

party." *Jones v. Chandrasuwan*, 820 F.3d 685, 691 (4th Cir. 2016) (quoting *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 312 (4th Cir. 2013)).

## II.    DISCUSSION

To prevail on summary judgment in his deliberate-indifference claim against Dr. Ghorayeb, Plaintiff must demonstrate there is no genuine issue of material fact for each of the three essential elements necessary to be established in an action under 42 U.S.C. § 1983 regarding access to medical care in prison. Fed. R. Civ. P. 56(a). Specifically, Plaintiff must demonstrate that: (1) the defendant(s) acted under color of state law; (2) the defendant(s) violated Plaintiff's Eighth-Amendment right to be free from cruel and unusual punishment by exhibiting deliberate indifference to his serious medical needs; and (3) the defendant(s)' constitutional violation caused the inmate's damages. 152 Am. Jur. Trials 141 (2017) (citing 42 U.S.C. § 1983).

It is undisputed that Defendants acted under color of law within the scope of the first element. *See Conner v. Donnelly*, 42 F.3d 220 (4th Cir. 1994). Accordingly, the undersigned's analysis focuses upon the second and third elements of this cause of action: deliberate indifference and causation.

### a. Timeliness of Motion

As an initial matter, Dr. Ghorayeb challenged the timeliness of Plaintiff's motion on the grounds that Plaintiff is seeking summary judgment prior to the close of discovery and prior to the dispositive motions filing deadline. However, the Federal Rules of Civil Procedure allow a party to move for summary judgment "at any time until 30 days after the close of discovery" unless the Court orders otherwise. Fed. R. Civ. P. 56(b). To obtain a Court order deferring consideration of the motion on this basis, Dr. Ghorayeb must demonstrate "by affidavit or declaration that, for specified reasons, [he]

cannot present facts essential to justify [his] opposition[.]" Fed. R. Civ. P. 56(d). As Plaintiff pointed out in his reply, Dr. Ghorayeb raised the issue of timeliness in his response, but failed to submit an affidavit or declaration attesting to his inability to present essential facts under Rule 56(d); accordingly, Defendant's challenge to the timeliness of Plaintiff's motion has no merit.

### b.  Deliberate Indifference

To demonstrate the second essential element of Plaintiff's § 1983 claim—deliberate indifference to an inmate's serious medical needs—Plaintiff must establish both an objective and a subjective element. *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). This discussion addresses each element in turn.

### i.  Objective Component

The objective element requires a showing that the prisoner's medical condition was sufficiently serious—in other words, the medical condition is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Formica v. Aylor*, 739 F. App'x 745, 754 (4th Cir. 2018). Here, while the parties dispute the etiology of Plaintiff's symptoms, the parties do not dispute that Plaintiff had a medical condition pertaining to his right eye, and that this condition was sufficiently serious.

### ii.  Subjective component

The subjective element of a deliberate-indifference claim requires Plaintiff to establish that Dr. Ghorayeb subjectively knew of, *and* disregarded, an excessive risk to Plaintiff's health or safety; this element is a question of fact. *Hixson v. Moran*, 1 F.4th 297, 302 (4th Cir. 2021). Phrased another way, "[t]o be deliberately indifferent, the official must have 'actual knowledge of the risk of harm to the inmate' and also 'must

have actually known that their response was inadequate to address those needs.'" *Coleman v. Poff,* 497 F. App'x 337, 339 (4th Cir. 2012) (quoting *Iko,* 535 F.3d at 241–42); *see also Formica v. Aylor*, 739 F. App'x 745, 755 (4th Cir. 2018) ("A deliberate indifference claim must satisfy a high bar, and that bar is not met by showing that "an official *should* have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction."); *Abraham v. McDonald*, 493 F. App'x 465, 466 (4th Cir. 2012) (explaining that "mere negligence in diagnosis or treatment is insufficient to state a constitutional claim").

It is undisputed that—as a board-certified ophthalmologist and Associate Professor for the West Virginia University School of Medicine—Dr. Ghorayeb had knowledge about the risk to patients with untreated chronic sarcoidosis. It is further undisputed that Dr. Ghorayeb first saw Plaintiff on January 11, 2018, but did not prescribe oral Prednisone until July 3, 2018. Relying on these admissions, Plaintiff points to (1) the opinion of Elise Johnson, M.D. ("Dr. Johnson") in Plaintiff's Medical Screening Certificate of Merit regarding the standard of care for chronic sarcoidosis; (2) excerpts of articles and YouTube videos from Plaintiff's Internet research regarding the treatment of sarcoidosis that Plaintiff incorporated into his "West Virginia Code § 55-7B-6(c) Statement;" and (3) Plaintiff's own construed attestation that "[t]he medical standard of care required the ophthalmologists to treat Mr. Johnson's sole eye with corticosteroids such as prednisone, the mainstay of systemic treatment for patients with chronic uveitis." (ECF No. 106-1 at 7.)

Setting aside the evidentiary problems raised by Dr. Ghorayeb, even assuming—for the purposes of this discussion only—that Plaintiff's evidence sufficiently established

that the standard of care for the treatment of chronic sarcoidosis required Dr. Ghorayeb to prescribe oral corticosteroids such as Prednisone, this fact alone does not establish the deliberate-indifference element of Plaintiff's § 1983 claim. While a breach in the standard of care may demonstrate negligence or medical malpractice, "something more than mere negligence" is required to satisfy the deliberate-indifference element. *Patten v. Nichols*, 274 F.3d 829, 834 (4th Cir. 2001); *see also Iko*, 535 F.3d at 241 ("Deliberate indifference is a very high standard—a showing of mere negligence will not meet it."); *Abraham*, 493 F. App'x at 466 (explaining that "mere negligence in diagnosis or treatment is insufficient to state a constitutional claim"); *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014) (finding that the plaintiff, "though describing behavior that might support a medical malpractice claim, d[id] not make out a case of deliberate indifference"); *Coleman v. Poff*, 497 F. App'x 337, 339 (4th Cir. 2012) (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)) ("Thus, negligence or medical malpractice is insufficient to establish deliberate indifference; rather, the treating official must entirely fail to consider the inmate's medical complaints or intentionally delay or deny access to adequate medical care."). Rather, Plaintiff must show that Dr. Ghorayeb also actually did "recognize[] that his actions were insufficient to mitigate the risk of harm to [Plaintiff] arising from his medical needs." *Iko*, 535 F.3d at 241 (emphasis in original).

The evidence at hand falls short of establishing that Dr. Ghorayeb drew the inference that delaying the prescription of Prednisone would subject Plaintiff to an excessive risk to his health or safety—particularly where, as here, Dr. Ghorayeb responded to Plaintiff's motion with conflicting evidence. Dr. Ghorayeb attested that, among other things, "[u]ntil July 3, 2018, [Plaintiff's] ocular inflammation was well controlled on Durezol, a steroid eyedrop, and there was no indication for an escalation

in care to an oral steroid, especially given the patient's comorbid ocular diagnoses." (ECF No. 101-13.) Furthermore, when Plaintiff presented to Dr. Ghorayeb on July 3, 2018, Dr. Ghorayeb noted that "once [Plaintiff's inflammation was] quiet *or if diagnosis remains elusive*," he "may consider therapeutic vs diagnostic PPV." (ECF No. 106-1 at 78.) A few weeks later on July 31, 2018, Dr. Ghorayeb noted that diagnosis remained elusive, and he proceeded to recommend vitrectomy surgery for both therapeutic *and diagnostic* purposes, with a plan to send a biopsy to cytology and pathology to rule out lymphoma; he also indicated he wanted to "check some baseline labs" to rule out infection. (ECF No. 106-7.) The subsequent pathology report did not show findings indicative of sarcoidosis, as Plaintiff's vitreous fluid was *negative* for large atypical lymphocytes, blasts or granulomas. (ECF No. 106-8.)

Plaintiff's own expert, Dr. Johnson, acknowledged in her Medical Screening Certificate of Merit that "[s]arcoidosis can be difficult to diagnose because the disease often produces few signs and symptoms in its early stages," and "[w]hen symptoms do occur, they may mimic those of other disorders." (ECF No. 106-1 at 9.) Further, Dr. Johnson acknowledged that "Prednisone has many adverse side-effects that requires consideration of a steroid spar[]ing drug" and that Plaintiff reported on July 10, 2018 and July 30, 2018, he felt Prednisone was making his vision worse. (ECF No. 106-1.)

Thus, at best Plaintiff has merely shown that there is a genuine dispute of material fact as to Dr. Ghorayeb's subjective state of mind in delaying the prescription of oral Prednisone to Plaintiff—specifically, whether Dr. Ghorayeb had actual knowledge of the risk of harm to Plaintiff by Dr. Ghorayeb's delay in prescribing oral Prednisone in Plaintiff's case, and whether Dr. Ghorayeb actually drew the inference that his delay in prescribing oral Prednisone subjected Plaintiff to an excessive risk to his health or

safety. *Coleman*, 497 F. App'x at 339. Accordingly, summary judgment is simply improper at this juncture. *Strothers v. City of Laurel, Md.*, 895 F.3d 317, 326 (4th Cir. 2018) (quoting *Anderson*, 477 U.S. at 248) (explaining that "A genuine dispute arises when "the evidence is such that a reasonable jury could return a verdict for the non-moving party").

### c. Causation

The causation element of Plaintiff's § 1983 claim against Dr. Ghorayeb requires him to establish that Dr. Ghorayeb's delay in prescribing Prednisone caused Plaintiff's alleged injury. *See Coppage v. Mann*, 906 F. Supp. 1025, 1035 (E.D. Va. 1995) (explaining that the causation element required the plaintiff to show "that the challenged conduct caused him injury"); *Goebert v. Lee Cty.*, 510 F.3d 1312, 1326 (11th Cir. 2007) (explaining that "[t]o prevail on a deliberate indifference to serious medical need claim," a plaintiff must show three elements, including "causation between th[e] [defendant's] indifference and the plaintiff's injury"). *See also Shaw v. Stroud*, 13 F.3d 791, 800 (4th Cir. 1994) (explaining that "the causal link in § 1983 cases is analogous to proximate cause").

In support, Plaintiff relied upon Dr. Johnson's opinion set forth in the Medical Screening Certificate of Merit, and his own construed attestation that Dr. Ghorayeb's failure to systemically treat Plaintiff's sarcoidosis with Prednisone "was a proximate cause of Mr. Johnson's blindness and injury through surgery." (ECF No. 106-1 at 7.)

In response, Dr. Ghorayeb argued that "although Plaintiff's medical providers reference his history of sarcoidosis and provided treatment to some extent based on his reported past medical history, there were instances when the clinical findings did not correlate to Plaintiff's reported medical history" and in fact "the medical records are

inconclusive as to that diagnosis." (ECF No. 101 at 10, 13.) In support, Dr. Ghorayeb proffered the pathology report following Plaintiff's surgery which showed that a specimen taken from Plaintiff's right eye was negative for malignant cells, large atypical lymphocytes, blasts, or granulomas associated with sarcoidosis. (ECF No. 101-8.) Further, Dr. Ghorayeb submitted medical records to support his argument that the delay in prescribing Prednisone did not result in worsened vision. Dr. Ghorayeb pointed to records showing that, as early as 2010, Plaintiff was observed to already have "longstanding chronic poor vision loss." (ECF No. 101-1 at 2.) Dr. Ghorayeb also pointed out that a visual acuity exam performed by Dr. Hunt showed "stable, or even a slight improvement, from Plaintiff's visual acuity of hand motions at his face at his initial office visit to [the Eye Institute]." (ECF No. 101 at 15 (citing ECF Nos. 101-10 through 101-12).)

In reply, Plaintiff first argued that Dr. Ghorayeb failed to properly demonstrate the applicable standard of care in his Affidavit. (ECF No. 106 at 3.) Further, Plaintiff argued that Dr. Ghorayeb breached the applicable standard of care by failing to request and review medical records from Plaintiff's primary-care physician and from the Federal Bureau of Prisons. (ECF No. 106 at 16.) However, just like the deliberate-indifference element discussed in section III.b., *supra*, even assuming—for purposes of discussion only—that Plaintiff's evidence sufficiently demonstrates Dr. Ghorayeb breached the standard of care, Plaintiff nonetheless must establish a causal link between Dr. Ghorayeb's breach and Plaintiff's alleged injuries or increased risk of harm.

While Dr. Johnson's Medical Screening Certificate of Merit opines that his treating physicians' delay in prescribing Prednisone was the cause of his alleged injuries, Dr. Ghorayeb responded with conflicting evidence which showed that Plaintiff's right-

eye vision slightly improved from the time he began treating at the Eye Institute, and that Plaintiff's post-surgery eye biopsy was negative for signs of sarcoidosis. On June 15, 2020, an ophthalmologist not associated with the Eye Institute documented that Plaintiff was able to count fingers at a distance of two feet with his right eye—an improvement from being able to see "hand motions at face" in 2016, before Plaintiff presented to the Eye Institute. (ECF No. 101-12.)

In fact, while Plaintiff pointed to medical records that he claims establish his pre-incarceration diagnosis with sarcoidosis, those records only demonstrate Plaintiff's own report of his medical history; for instance, Plaintiff attached a BOP medical record from September 25, 2017 indicating he had "a history of blindness (secondary to complications of Sarcoidosis and Glaucoma), [hypertension], and Gout." (ECF No. 106-1 at 17.) However, Plaintiff omits that this history is listed under a heading titled "Subjective," and pertains to Plaintiff's reported medical history. *See id*. While Plaintiff affirmatively *reported* being diagnosed with chronic sarcoidosis when conveying his medical history to his treating physicians, the record before the Court is devoid of any documentation confirming when or by whom Plaintiff was purportedly diagnosed before he was first seen at the Eye Institute.

In addition to the lack of evidence in Plaintiff's medical records, Plaintiff's own accounts of his diagnosis with chronic sarcoidosis is conflicting. On May 2, 2018, Plaintiff reported that he "was diagnosed with sarcoidosis in 1994 and is unsure if he received a biopsy." (ECF No. 106-1 at 87.) Plaintiff reported on October 16, 2018 that "he was diagnosed with sarcoidosis in 1993, but has never had a lymph node biopsy." (ECF No. 101-9.) Plaintiff alleged in his Amended Complaint that he "was diagnosed in 2003 with chronic sarcoidosis in his right eye." (ECF No. 16 at ¶ 18.) And in his discovery

responses, Plaintiff stated that "I did have a tissue biopsy for sarcoidosis at the Eye, Eye [*sic*] and Nose Clinic in the early 1990s." (ECF No. 95-22 at 12.) Additionally, Court records from Plaintiff's 2016 conviction show that Plaintiff reported being diagnosed with sarcoidosis in 1992. At that time, Plaintiff also reported that he was legally blind, that his vision began to decline in the early 1990s, and that he had only a small amount of vision in his right eye.

Thus, when viewing the facts and all justifiable inferences arising therefrom in the light most favorable to Dr. Ghorayeb as the nonmoving party—as the Court must do at this procedural posture—the medical records cited by Dr. Ghorayeb along with other evidence constitutes sufficient proof in the form of admissible evidence to show that there is a genuine issue of material fact on the element of causation. *Guessous*, 828 F.3d at 216. As such, summary judgment is improper at this juncture.

## III.    RECOMMENDATION

For the foregoing reasons, the undersigned respectfully **RECOMMENDS** that Plaintiff's Motion for Partial Summary Judgment (ECF No. 97) be **DENIED**.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, Chief United States District Judge. Pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from the date of the filing of this Proposed Findings and Recommendation to file with the Clerk of this Court specific written objections identifying the portions of the Proposed Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted by the presiding District Judge

for good cause shown. Copies of any objections shall be provided to the opposing party or, if it is represented by counsel, to its counsel, and to Judge Johnston.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Fourth Circuit Court of Appeals. 28 U.S.C. § 636(b)(1); *see Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).

The Clerk is **DIRECTED** to file this Proposed Findings and Recommendation and to mail a copy of the same to Plaintiff.

ENTER:        February 17, 2023

Dwane L. Tinsley
United States Magistrate Judge