UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

TIMOTHY A. JOHNSON,

        Plaintiff,

v.                                                    CIVIL ACTION NO.   2:21-cv-00380

WEST VIRGINIA UNIVERSITY BOARD
OF GOVERNORS, et al.,

        Defendants.

**PROPOSED FINDINGS & RECOMMENDATION**

This matter is assigned to the Honorable Thomas E. Johnston, Chief United States District Judge, and it is referred to the undersigned United States Magistrate Judge for submission of proposed findings and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (ECF No. 4.) Pending before the court are the "Motion for Partial Summary Judgment as to Statute of Limitations Defense by Defendant Lingo Lai, M.D.," filed by Plaintiff Timothy A. Johnson ("Plaintiff") (ECF No. 99), and the "Cross-Motion for Partial Summary Judgment as to the Statute of Limitations" filed by Defendant Lingo Lai, M.D. ("Dr. Lai" or "Defendant") (ECF No. 104.) The opposing parties' cross-motions each seek summary judgment on the issues of whether Plaintiff's medical-malpractice and deliberate-indifference claims are barred by their applicable statute of limitations. For the reasons set forth herein, the undersigned respectfully **RECOMMENDS** that Plaintiff's motion (ECF No. 99) be **GRANTED**, and Dr. Lai's motion (ECF No. 104) be **DENIED**.

I.  BACKGROUND

This civil action arises from medical care Plaintiff received from Defendant Lingo Lai, M.D. ("Dr. Lai") and Defendant Richard Ghorayeb, M.D. ("Dr. Ghorayeb") at the West Virginia Eye Institute in Morgantown, West Virginia, during Plaintiff's term of incarceration at the Federal Correctional Institution in Morgantown, West Virginia ("FCI-Morgantown"). (ECF No. 16 at 4 ¶¶ 17-23.) As to Dr. Lai, Plaintiff asserts that she "negligently and recklessly" failed to treat a condition called sarcoidosis in his right eye with the "first line" course of the oral steroid Prednisone between July 24, 2017, and December 13, 2017, which Plaintiff claims necessitated surgery on his right eye on August 6, 2018, and ultimately led to irreversible loss of vision that Plaintiff asserts rendered him legally blind in his right eye—allegedly the only eye in which he had had any remaining sight. (ECF No. 16 at 8 ¶¶ 44-45.)

In 2016, Plaintiff was sentenced to sixty months in federal prison. *See United States v. Johnson*, 2:15-cr-99, ECF No. 53 (S.D. W. Va. Mar. 23, 2016). Plaintiff entered into the custody of the Bureau of Prisons ("BOP") at FCI-Morgantown on May 3, 2016, and was subsequently seen by BOP medical staff. (ECF No. 106-1 at 65.) BOP medical records from May 12, 2016 show that Plaintiff was observed being able "to ambulate back to waiting room from exam room" by himself, negotiating "the door way, wall, protruding cabinets and other inmates without incident or attempting to feel for landmarks or assistance from staff." (ECF No. 106-1 at 39, 53.) Additionally, Plaintiff was able to sign a consent form "with minimal assistance," was "observed looking at various objects in office/wall," and opened his mouth in anticipation of a temperature probe before the probe reached his mouth. *Id.* After being examined by a BOP optometrist, the BOP ultimately referred Plaintiff to the West Virginia University Medical Corporation d/b/a

2

University Health Associates – West Virginia Eye Institute (the "Eye Institute"). (ECF No. 106-1 at 6.)

Plaintiff presented to the Eye Institute for his initial visit on June 14, 2016, where he was evaluated by ophthalmologist Dr. Kenneth Mitchell. (ECF No. 1-3 at 52.) Plaintiff reported "that he thought his vision in his right eye was getting worse" at this visit. (ECF No. 106-1 at 6.) Plaintiff states that he was assessed with "uveitic glaucoma, advanced OU (in both eyes) – suspect sarcoid as etiology." (ECF No. 106-1 at 6.) Plaintiff's medical records show that Dr. Mitchell noted Plaintiff's right-eye visual acuity allowed him to see only hand motions at his face. (ECF Nos. 1-3 at 52; 101-2.) Dr. Mitchell also noted Plaintiff's reported history of glaucoma, sarcoidosis, and poor vision in his right eye. *Id*. Upon examination, Dr. Mitchell noted a fibrosis near the optic nerve in Plaintiff's right eye; thereafter, Plaintiff was referred to several specialists at the Eye Institute to assist in investigating the cause of Plaintiff's symptoms. (ECF No. 106-1 at 56.)

Plaintiff was first seen by Dr. Lai on June 14, 2017. (ECF No. 103-1.) Plaintiff reported that he felt his vision was gradually decreasing and was looking cloudy since his last visit with Dr. McMillan. *Id*. at 4. He also reported dull eye pain in both eyes, but worse in the left eye. *Id*. at 5. On examination, it was noted that Plaintiff's right-eye visual acuity allowed him to count fingers at his face. *Id*. at 7. Dr. Lai observed "1+ flare, trace cell" and "fibrotic membrane extending from disc into vitreous" in Plaintiff's right eye. *Id*. at 6, 8. Dr. Lai prescribed Durezol—a type of ophthalmic eye drops containing a corticosteroid— and instructed Plaintiff to follow up in two weeks. *Id*.

Plaintiff followed up with Dr. Lai on July 24, 2017. (ECF No. 103-2 at 4.) He reported experiencing itching and sharp pain in both eyes, but his vision was "about the same." *Id*. His right-eye visual acuity was noted to be able to count fingers at a distance of

three feet. (ECF No. 103-2 at 7.) Dr. Lai continued Plaintiff on his Durezol eye drops and directed Plaintiff to follow up with Dr. McMillan in two months for glaucoma management. *Id.* at 6.

On December 13, 2017, Plaintiff followed up with Dr. Lai at the Eye Institute. (ECF No. 106-1 at 65.) Plaintiff reported increased light sensitivity and flashes of light "that were noted on last visit in November as well," along with worsening vision, floaters, photophobia—the medical term for light sensitivity—and "a hard time focusing" in his right eye "over the past few months." (ECF Nos. 103-3 at 5106-1 at 65-66, 72.) Dr. Lai noted a "very difficult dilated exam secondary to small palpebral fissure and [Plaintiff's] photophobia." *Id.* at 72. However, Dr. Lai was able to observe "fibrosis near [Plaintiff's optic] nerve" as well as "1+ flare, trace cell." *Id.* Plaintiff's right-eye visual acuity indicated Plaintiff could count fingers from a distance of one foot, and his intra-ocular pressure was noted to be "excellent" that day. (ECF No. 103-3 at 7-8.) Dr. Lai continued Plaintiff on Durezol. *Id.* at 7. Dr. Lai discussed "the signs and symptoms of retinal detachment in detail with [Plaintiff] including flashes of light," and referred Plaintiff to Dr. Ghorayeb to evaluate Plaintiff for retinal detachment and to evaluate the fibrosis that Dr. Lai identified near Plaintiff's optic nerve. (ECF Nos. 103-3 at 7; 106-1 at 65, 72.) She noted that "conjuntivochalasis in [Plaintiff's right eye] may be contributing" to Plaintiff's report of worsening vision, although it "does not explain [the] flashes of light [Plaintiff] has been reporting." (ECF No. 106-1 at 72.) Accordingly, Dr. Lai noted that she would consider an onjunctivochalasis excision if Dr. Ghorayeb's "retina eval is normal and [Plaintiff] still has blurry vision." (ECF No. 103-3 at 7.)

Dr. Ghorayeb saw Plaintiff for an initial consultation on January 11, 2018. (ECF No. 106-1 at 65, 83.) Dr. Ghorayeb assessed Plaintiff for sarcoidosis, pseudophakia of both

eyes, and chronic uveitis of both eyes. (ECF No. 106-1 at 70.) Medical records from this visit noted a "difficult examination" with a poor view to the back of the right eye, but Dr. Ghorayeb was able to see fibrosis starting around Plaintiff's optic nerve; fluid pressure in the eye was noted as stable, but Dr. Ghorayeb also noted a "[t]race cell with 2+ flare." (ECF No. 106-1 at 70, 82.) Dr. Ghorayeb noted that it was "unclear" whether the fibrosis had been present before, but the "[o]verall traction from fibrosis [was] not significant." *Id.* Further, Dr. Ghorayeb indicated Plaintiff may have an "Inferior BRAO," or branch retinal artery occlusion. (ECF No. 106-1 at 70.) Dr. Ghorayeb directed Plaintiff to continue on his prescribed Durezol eye drops, and noted that he would "monitor and reassess in 4 months." *Id.* Additionally, Dr. Ghorayeb noted that he would "consult Pulmonology to confirm lack of systemic progression and lack of need for systemic treatment." *Id.*

On May 2, 2018, Plaintiff presented to Pulmonary/Critical Care Fellow Mohamad B. Abdelfattah, M.D., and Dr. Abdelfattah's attending pulmonologist, Hatim Al-Jaroushi, M.D., on referral from Dr. Ghorayeb. (ECF No. 106-1 at 87-88.) Dr. Abdelfattah noted that Plaintiff "denies any active pulmonary complaints and does not currently have an indication for treatment of his sarcoidosis." *Id.* at 88. Dr. Abdelfattah ordered several tests, encouraged Plaintiff to follow up regularly with his ophthalmologist, and directed him to return in six months. *Id.*

Approximately two weeks later on May 15, 2018, Plaintiff followed up with Dr. Ghorayeb. (ECF No. 106-1 at 74.) Plaintiff reported that his light sensitivity had not improved since the last visit, but his vision had not changed; he denied any current eye pain. *Id.* at 66, 74. Dr. Ghorayeb noted that "[v]ision in both eyes are stable. No problem with flashing or curtains in both eyes." *Id.* at 89. Dr. Ghorayeb further noted that Plaintiff

5

saw Dr. Abdelfattah, who had ordered baseline testing. *Id.* Dr. Ghorayeb directed Plaintiff to follow up in three months. *Id.*

On June 22, 2018, Plaintiff presented to the Emergency Department at West Virginia University Hospital in Morgantown, West Virginia (the "Emergency Department") complaining of headaches on the left side of his head that began five or six days before. (ECF No. 106-1 at 37, 50, 75.) Plaintiff reported "a h[istory] of headaches, however they typically resolved spontaneously and did not last this long." *Id.* Plaintiff also reported "associated blurred vision in R[ight] eye, photophobia, and dizziness" which followed the development of the headaches. *Id.* at 66, 75. On examination, Plaintiff reported he "can only see shapes in [his] right eye." *Id.* at 38, 51, 90. Additionally, Plaintiff's right cornea was noted to be cloudy. *Id.* at 37, 51. Plaintiff was prescribed "IVF bolus, Compazine and Benadryl" and examined by ophthalmology in the Emergency Department, where examination found that Plaintiff's vision was "at baseline." *Id.* Ophthalmology instructed the Emergency Department that Plaintiff was "suitable for discharge with follow up and prescription eye drops." *Id.*

Eleven days later on July 3, 2018, Plaintiff followed up with Dr. Ghorayeb for "Retina Problem" and informed Dr. Ghorayeb of being seen in the Emergency Department for a flare up. (ECF No. 106-1 at 51, 76.) Plaintiff reported decreased vision "to the point that it is very difficult to see to get around" over the previous month, as well as photophobia and cloudiness. *Id.* at 76. Dr. Ghorayeb's diagnosis was gout, pseudophakia of both eyes, and "[g]laucoma of both eyes associated with ocular inflammation, indeterminate stage." *Id.* at 77. Dr. Ghorayeb's plan of care was to "check some baseline labs to [rule out] infection and start 60 mg of oral prednisone," but he also noted that "[u]pon improvement of inflammation, would need to consider

6

rheum[atology] referral for steroid sparing agents." *Id.* at 78. Dr. Ghorayeb further noted that "[o]nce quiet or if diagnosis remains elusive, may consider [a] therapeutic vs diagnostic PPV" surgery. *Id.*

A week later on July 10, 2018, Plaintiff reported to Dr. Hinkle at the Eye Institute due to Dr. Ghorayeb's absence. (ECF No. 101-6.) Plaintiff reported that he was taking his prescribed 60 mg of Prednisone, but his right-eye vision had worsened over the past four or five days to the point that he could "see light and movement only." *Id.* Additionally, Plaintiff "state[d] he thinks the steroid caused his vision to decrease." *Id.* Records from that visit note that "vision is much worse on prednisone." *Id.* at 3. Plaintiff's right-eye visual acuity was noted to be "CF @ 8"," meaning he was able to count fingers from a distance of eight inches. *Id.* at 4. Dr. Hinkle's ophthalmic plan of care was to discontinue prednisone. (ECF No 106-1 at 3, 34, 48.) Dr. Hinkle discussed the option of prescribing the "steroid-saving" drug methotrexate, but "given worsening of symptoms on prednisone will discontinue this now and reassess in 2-3 weeks." *Id.*

On July 25, 2018, Plaintiff again presented to the Emergency Department and reported that he had finished his oral course of Prednisone approximately a week before. (ECF No. 106-1 at 79.) Plaintiff reported that he "had significant worsening of his [right] eye pain," including "sudden pain and flashing lights in his *left* eye" that morning as well as blurry vision and a "sandpaper like" feel. *Id.* at 66. On July 30, 2018, Plaintiff returned to the Eye Institute for his three-week follow-up appointment, where he was seen by Dr. McMillan. (ECF No. 106-1 at 80.) Medical records from that visit note that Plaintiff "is taking Prednisone and feels that it makes his vision worse." *Id.* Plaintiff described his vision as "cloudy and blurry," and he reported that his right eye "has 'lights' all the time" that worsened whenever waking up from sleep. *Id.* at 66, 80. The following day on July

31, 2018, Plaintiff returned to the Eye Institute. (ECF No. 106-1 at 66.) Dr. Ghorayeb noted that "Patient states he was here yesterday and was told to return. No pain. Vision is the same. Using all the same drops." (ECF Nos. 106-1 at 66, 81; 101-7 at 1.) Plaintiff reported "no improvement with drops." (ECF No. 101-7 at 3.) Dr. Ghorayeb recommended proceeding with "[d]iagnostic/therapeutic vitrectomy" surgery on Plaintiff's right eye, and indicated that he would send a biopsy from the procedure "for cytology and pathology" in order to rule out lymphoma. (ECF No. 101-7 at 4.)

On August 6, 2018, Dr. Ghorayeb performed "a diagnostic and therapeutic pars plana vitrectomy" ("PPV") surgery on "fibrosis starting around nerve" in Plaintiff's right eye. (ECF Nos. 106-1 at 66; 101-7 at 4.) While there is conflicting evidence concerning Plaintiff's post-surgery visual acuity, Plaintiff's testimony is that, after his recovery in the weeks following his PPV surgery, he recognized that his alleged vision loss in his right-eye was permanent. (ECF No. 10 at 24 (stating that he "realized his sight was not going to return to what it had been in the months prior").) Plaintiff was released from BOP custody on July 26, 2019. While conceding that he was permitted to review his medical records while in custody, Plaintiff explains that he was not able to obtain a copy of his medical records until August 27, 2019, approximately one month after his release. (ECF No. 100 at 4.)

Plaintiff filed suit in the Circuit Court of Kanawha County, West Virginia the following year on August 5, 2020; as to Dr. Lai, the Complaint alleged a medical-malpractice claim, as well as an Eighth Amendment claim against Dr. Lai for deliberate indifference to a serious medical need under 42 U.S.C. § 1983, based upon her failure to prescribe an oral corticosteroid such as prednisone during her treatment of the Plaintiff between July 24, 2017, and December 13, 2017. (ECF No. 1-3.) On March 1, 2021, Plaintiff

8

filed an Amended Complaint fleshing out the allegations on these claims. (ECF No. 16.) Plaintiff alleged in his Amended Complaint that Dr. Lai "negligently and recklessly failed to employ steroids to control the inflammation in his sole useful eye for approximately five (5) months from July 24, 2017 through December 13, 2017." (ECF No. 16 at ¶ 44.) Plaintiff asserts that Dr. Lai's failure to treat his eye condition with the "first line" course of the oral steroid Prednisone necessitated the August 6, 2018 PPV surgery and ultimately led to irreversible loss of vision that rendered him legally blind in his right eye, which he alleges was the only eye in which he had had any remaining sight. (ECF No. 16 at 8 ¶ 45.) In Plaintiff's Medical Screening Certificate of Merit that accompanied his Complaint, Dr. Camille Johnson opined that, "to a reasonable degree of medical certainty, if [Plaintiff] had been treated with corticosteroids and had been properly monitored, he would not have suffered vision loss or been required to have eye surgery due to [] inflammation from active sarcoidosis." (ECF No. 106-1 at 65.)

Subsequently on July 1, 2021, Defendants removed the action to this Court. (ECF No. 1.) Judge Johnston entered a Scheduling Order on August 24, 2021. (ECF No. 31.) Subsequently on January 13, 2022, Judge Johnston vacated the Scheduling Order after referring this matter to the undersigned "for total pretrial management and submission of proposed findings of fact and recommendations for disposition." (ECF No. 77.) The undersigned entered a new Scheduling Order on February 13, 2023, under which the deadline to complete discovery is set for October 13, 2023, and the deadline for the parties to move for summary judgment is set for November 27, 2023. (ECF No. 136.)

Plaintiff's and Dr. Lai's cross-motions *sub judice* each seek summary judgment on the issues of whether Plaintiff's medical-malpractice and deliberate-indifference claims

are barred by their applicable statute of limitations. The matter has been fully briefed and is now ripe for adjudication. (ECF Nos. 99, 100, 103, 104, 107.)

## I. LEGAL STANDARD

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material when it 'might affect the outcome of the suit under the governing law.'" *Strothers v. City of Laurel*, 895 F.3d 317, 326 (4th 19Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A genuine dispute arises when 'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" *Id.* (quoting *Anderson*, 477 U.S. at 248). "Thus, at the summary judgment phase, the pertinent inquiry is whether there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018) (alteration, internal quotation marks omitted).

"The burden is on the nonmoving party to show that there is a genuine issue of material fact for trial . . . by offering sufficient proof in the form of admissible evidence[.]" *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). In ruling on a motion for summary judgment, this Court "view[s] the facts and all justifiable inferences arising therefrom in the light most favorable to the nonmoving party." *Jones v. Chandrasuwan*, 820 F.3d 685, 691 (4th Cir. 2016) (quoting *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 312 (4th Cir. 2013)).

Where, as here, the Court is presented with motions for summary judgment from opposing parties, the same standard of review applies. *Tastee Treats, Inc. v. U.S. Fid. & Guar. Co.*, 5:07-cv-338, 2008 WL 2836701 (S.D. W. Va. July 21, 2008, *aff'd*, 474 F. App'x

101 (4th Cir. 2012). In this situation, the Court "must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law," resolving factual disputes and drawing inferences for the non-moving party as to each motion. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks and citations omitted); *see also Monumental Paving & Excavating, Inc. v. Pa. Mfrs.' Ass'n Ins. Co.*, 176 F.3d 794, 797 (4th Cir. 1999). Summary judgment is inappropriate, however, if there exist factual issues that reasonably may be resolved in favor of either party. *Creel v. Hudson*, 2:14-cv-10648, 2017 WL 4004579, at *2 (S.D. W. Va. Sept. 12, 2017) (citing *Anderson*, 477 U.S. at 250).

"[I]n the federal courts, cases involving defenses hinging on applicable statutes of limitations may lend themselves to summary judgment." *Wolf v. Preferred Risk Life Ins. Co.*, 728 F.2d 1304, 1306 (10th Cir. 1984). Summary judgment is improper on this issue, however, "if there is a 'viable issue of fact' as to when the limitations period began." *Id.* (citing *Ohio v. Peterson*, 585 F.2d 454, 457 (10th Cir. 1978)).

## II. DISCUSSION

### a. Plaintiff's Medical-Malpractice Claim Against Dr. Lai

As the presiding District Judge explained in denying Dr. Lai's motion to dismiss on the same issue, Plaintiff's medical-malpractice claim is governed by the West Virginia Medical Professional Liability Act ("MPLA"), which prescribes a two-year statute of limitations period:

> A cause of action for injury to a person alleging medical professional liability against a healthcare provider arises as of the date of injury, except as provided in subsection (c) of this section, and must be commenced within two years of the date of such injury, or within two years of the date when such person discovers, or with the exercise of reasonable diligence, should have discovered such an injury, whichever last occurs.

(ECF No. 83 at 19 (citing W. Va. Code § 55-7B-4(a).) Hence, the MPLA "requires an injured plaintiff to file a malpractice claim against a health care provider within two years of the date of the injury, or within two years of the date when such person discovers, or with the exercise of reasonable diligence, should have discovered such injury, whichever last occurs." Syl. Pt. 1, *Gaither v. City Hospital, Inc.*, 487 S.E.2d 901 (W. Va. 1997) (internal quotation marks omitted).

The Supreme Court of Appeals of West Virginia ("SCAWV") outlined the analysis to determine whether a cause of action is time barred as follows:

> First, the court should identify the applicable statute of limitations for each cause of action. Second, the court (or, if questions of material fact exist, the jury) should identify when the requisite elements of the cause of action occurred. Third, the discovery rule should be applied to determine when the statute of limitations began to run by determining when the plaintiff knew, or by the exercise of reasonable diligence should have known, of the elements of a possible cause of action.

Syl. Pt. 1, *Richards v. Walker*, 813 S.E.2d 923 (W. Va. 2018). Moreover, unless a statutory provision clearly prohibits application of the discovery rule, the statute of limitations begins to run when the plaintiffs knows—or by the exercise of reasonable diligence, should know—(1) the plaintiff has been injured, (2) the identity of the entity who owed the plaintiff a duty to act with due care, and who may have engaged in conduct that breached that duty, and (3) that the conduct of that entity has a causal relation to the injury. *Gaither*, 487 S.E.2d 901 at Syl. Pt. 4.

Plaintiff previously argued that the earliest the applicable statute of limitations would begin to run "would be the end of the recovery period of [his August 6, 2018] PPV surgery" on his right eye, when Plaintiff allegedly realized his sight would not return to what it had been at the time of his incarceration. (ECF No. 10 at 25.) The evidence

supports the Court's prior finding on Defendants' motion to dismiss that the statute began to run at the time Plaintiff recovered from his PPV surgery. (ECF No. 83 at 20-21.)

At the time he entered BOP custody in 2016, Plaintiff was observed to be able to ambulate by himself, sign documentation without significant assistance, and open his mouth in anticipation of an approaching thermometer. (ECF No. 106-1 at 39, 53, 65.) However, Plaintiff experienced decreased vision during his course of treatment at the Eye Institute. On June 14, 2016, during his first visit at the Eye Institute, Plaintiff reported that his vision was decreasing and it was noted that his right-eye visual acuity was limited to hand motions at face. (ECF Nos. 1-3 at 52; 101-2.) Plaintiff saw Dr. Lai on July 24, 2017, where his right-eye visual acuity was measured as being able to count fingers from a distance of three feet—an improvement from his first examination. (ECF No. 103-2 at 7.) On December 13, 2017, however—Dr. Lai's last relevant treatment date—Plaintiff reported worsening vision, and his right-eye visual acuity was measured as being able to count fingers from a distance of one foot. (ECF Nos. 101-6 at 3-4; 106-1 at 3, 34, 48.) By July 10, 2018, Plaintiff again reported worsening vision and his right-eye visual acuity had decreased to counting fingers from a distance of eight inches. The PPV surgery followed shortly thereafter on August 6, 2018. (ECF Nos. 106-1 at 66; 101-7 at 4.)

The evidence of Plaintiff's right-eye visual acuity during his treatment at the Eye Institute is uneven; while there was an improvement from his first visit, where he was only able to see "hand motions at face" with his right eye, there is also a downward trend between July 24, 2017, and July 10, 2018. While there is conflicting evidence regarding Plaintiff's right-eye visual acuity following surgery (*see* ECF No. 105 at 4), Plaintiff attests that he was rendered legally blind in his right eye. (ECF No. 106-1 at 7.) According to Plaintiff, it was not until his recovery in the months following the August 6, 2018 surgery

that he allegedly realized his sight would not return to what it had been. (ECF No. 10 at 24.)

Thus, it was not until after his recovery from the August 8, 2018 PPV surgery conducted by Dr. Ghorayeb that Plaintiff knew the fact of his allegedly permanent "blindness and injury through surgery" (ECF No. 106-1 at 7), as well as the identity of all the physicians potentially playing a causal role. As the Court previously explained, "Plaintiff could have, and did, discover the identities of the other parties involved in his treatment in the weeks following his PPV surgery," at which time "he was aware that he suffered injury[,] . . . was aware of where his surgery took place, and was aware which physicians treated him both before and after the PPV surgery." (ECF No. 83 at 22.) The number of weeks it took Plaintiff to recover from surgery thereafter is irrelevant; even measuring from the date of surgery itself—August 6, 2018—it is clear that Plaintiff's August 5, 2020 Complaint was filed "within two years of the date when [Plaintiff] . . . with the exercise of reasonable diligence, should have discovered" his alleged injury. W. Va. Code § 55-7B-4(a).

In addition to disputing Plaintiff's allegation of post-surgery vision loss, Dr. Lai argued that "if Plaintiff subjectively believed he had worsening vision, he would have known that information by the last office visit with Dr. Lai," at which time Plaintiff was also "aware of the identi[t]y of Dr. Lai and knew she had not prescribed oral steroids during her treatment." (ECF No. 105 at 4.) This argument, however, sidesteps Plaintiff's point that he had no indication his vision loss would be permanent until after the PPV surgery. Moreover, Plaintiff's alleged injuries include not only decreased vision, but the fact of surgery itself; Plaintiff's Amended Complaint asserts that his health care providers' failure to start Prednisone early and aggressively *necessitated* the August 6, 2018 PPV

14

surgery. (ECF No. 16 at 8 ¶ 45.) Plaintiff could not have known any causal relation between the surgery and Dr. Lai's treatment until the fact of the surgery itself. *See Gaither*, 487 S.E.2d 901 at Syl. Pt. 4 (explaining that the statute of limitations does not begin to run until, *inter alia*, Plaintiff knows or by the exercise of reasonable diligence, should know that a defendant's conduct has a causal relation to the injury). Plaintiff's Complaint was thus filed within the time provided by W. Va. Code § 55-7B-4(a), and the statute of limitations does not bar Plaintiff's medical-malpractice claim against Dr. Lai.

Accordingly, it is respectfully **RECOMMENDED** that Plaintiff's motion for summary judgment on the issue of the statute of limitations be **GRANTED**, and Dr. Lai's motion for summary judgment on the same issue be **DENIED**.

### b. Plaintiff's § 1983 Claim Against Dr. Lai

The Supreme Court of the United States explained that, in the context of § 1983 claims, "federal law looks to the law of the State in which the cause of action arose" and utilizes the statute of limitations "which the State provides for personal-injury torts[.]" *Wallace v. Kato*, 549 U.S. 384, 387 (2007) (citing *Owens v. Okure*, 488 U.S. 235, 249-50 (1989)). *See also Estate of Knight v. Hoggard*, 182 F.3d 908 (4th Cir. 1999) (citing *Nasim v. Warden, Md. House of Correction*, 64 F.3d 951, 955 (4th Cir. 1995) (en banc)). Generally, the cause of action arises in the state in which the alleged constitutional violation giving rise to the § 1983 claim occurred. *DePaola v. Clarke*, 884 F.3d 481, 486 (4th Cir. 2018). Because it is undisputed that all of the events giving rise to this civil action occurred in West Virginia, the West Virginia statute of limitations for personal injuries will therefore apply. The statute of limitations to file a personal injury claim in West Virginia is two years "after the right to bring the same shall have accrued." W. Va. Code § 55-2-12(b).

As the U.S. Supreme Court explained in *Wallace*, while state law governs the applicable statute of limitations in a § 1983 action, federal law governs the accrual date. *Wallace*, 549 U.S. at 387. *See also Nasim*, 64 F.3d at 955 ("[T]he question of when a cause of action *accrues* under 42 U.S.C. § 1983 remains one of federal law"). In the Fourth Circuit, "for purposes of a § 1983 claim, a cause of action accrues either when the plaintiff has knowledge of his claim or when he is put on notice—e.g., by the knowledge of the fact of injury and who caused it—to make reasonable inquiry and that inquiry would reveal the existence of a colorable claim." *Knight*, 182 F.3d 908 (citing *Nasim*, 64 F.3d at 955); *see also Brooks v. City of Winston-Salem*, 85 F.3d 178, 181 (4th Cir. 1996). *See also Ouellette v. Beaupre*, 977 F.3d 127, 139 (1st Cir. 2020) (stating that the applicable statute of limitation in a § 1983 action starts to accrue "when sufficient facts are or should be uncovered through the exercise of due diligence to give a plaintiff enough information about his or her injury and its cause to file suit"); *Johnson v. Chudy*, 822 Fed. App'x 637, 638 (9th Cir. 2020) (explaining that an Eighth Amendment deliberate indifference claim accrued when plaintiff knew or had reason to know, through reasonable diligence, that her psychological injuries were caused by defendants' improper conduct); *Richards v. Mitcheff*, 696 F.3d 635, 637 (7th Cir. 2012) (stating that a § 1983 cause of action starts to accrue "when a person knows his injury and its cause").

As a result, Plaintiff's § 1983 claim shares the same two-year limitations period, along with the same standard for measuring the accrual date set forth in *Gaither*, 487 S.E.2d 901 at Syl. Pt. 4, as set forth with respect to Plaintiff's medical-malpractice claim *supra*. It was only after his August 6, 2018 PPV surgery that Plaintiff was armed with the necessary factual predicate to file suit, including knowledge of both an injury and the injury's likely causal connection with Dr. Lai. Accordingly, for the same reasons set forth

above, Plaintiff's § 1983 claim was timely filed, and the undersigned respectfully **RECOMMENDS** that Plaintiff's motion for summary judgment on the issue of the statute of limitations be **GRANTED**, and Dr. Lai's motion for summary judgment on the same issue be **DENIED**.

### III.  RECOMMENDATION

For the foregoing reasons, the undersigned respectfully **RECOMMENDS** that Plaintiff's motion (ECF No. 99) be **GRANTED**, and Dr. Lai's motion (ECF No. 104) be **DENIED**.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, Chief United States District Judge. Pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from the date of the filing of this Proposed Findings and Recommendation to file with the Clerk of this Court specific written objections identifying the portions of the Proposed Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown. Copies of any objections shall be provided to the opposing party or, if it is represented by counsel, to its counsel, and to Judge Johnston.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Fourth Circuit Court of Appeals. 28 U.S.C. § 636(b)(1); *see Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).

The Clerk is **DIRECTED** to file this Proposed Findings and Recommendation and to mail a copy of the same to Plaintiff.

ENTER: February 22, 2023

Dwane L. Tinsley
United States Magistrate Judge